

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

---

*James G. Warwick*
*Assistant United States Attorney*
*James.Warwick@usdoj.gov*

*Suite 400*
*36 S. Charles Street*
*Baltimore, MD 21201-3119*

*DIRECT: 410-209-4860*
*MAIN: 410-209-4800*
*FAX: 410-962-0717*

August 31, 2016

William B. Purpura, Esq.
Purpura & Purpura Attorneys at Law
The Bonaparte Building
8 E. Mulberry Street
Baltimore, Maryland 21202

    Re:  *United States v. Tavon Slowe*
        Criminal Nos. CCB-15-0043 and CCB-15-0550

Dear Mr. Purpura:

  This letter, together with the Sealed Supplement, confirms the plea agreement which has been offered to the Defendant by the United States Attorney's Office for the District of Maryland ("this Office"). **The pleas are tendered pursuant to Rule 11(c)(1)(C). The agreed sentence under CCB-15-0043 is ten years on Count One of that Indictment, said sentence to run concurrently with a sentence within the range of 23 to 27 years on Count Two under CCB-15-0550.** If the Defendant accepts this offer, please have him execute it in the spaces provided below. The terms of the agreement are as follows:

<u>Offenses of Conviction</u>

  1.  The Defendant agrees to plead guilty to Count One of Indictment CCB-15-0043, now pending against him, which charges him with the Use of Interstate Commerce Facilities in the Commission of Murder-for-Hire, in violation of 18 U.S.C. § 1958, and also to plead guilty to Count Two of Indictment CCB-15-0550, which charges him with Discharge of a Firearm During and in Relation to a Crime of Violence Resulting in Death, in violation of 18 U.S.C. § 924(c) and (j).. The Defendant admits that he is, in fact, guilty of these offenses and will so advise the Court.

<u>Elements of the Offense</u>

  2.  The elements of the offenses to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

  a) Count One of CCB-15-0043: Use of Interstate Commerce Facilities in the Commission of Murder-for-Hire (18 U.S.C. § 1958)

    1. That the Defendant did use interstate commerce facilities, including cellular phones;

2. That the Defendant's use of an interstate commerce facility (including cellular phones), was done with the intent that a murder be committed in violation of the laws of any State or the United States; and

3. That the murder in question was intended to be committed as consideration for the receipt of, or as consideration for a promise or agreement to pay anything of pecuniary value.

b) Count Two of CCB-15-0550: Discharge of a Firearm During and in Relation to a Crime of Violence Resulting in Death (18 U.S.C. § 924(c) and (j)):

1. First, that the Defendant committed a crime of violence—that is, conspiracy to use interstate commerce facilities in a murder-for-hire resulting the death of Gregory Parker, in violation of 18 U.S.C. § 1958—as charged in Count One of the Indictment in CCB-15-0550;

2. Second, that the Defendant knowingly used a firearm—specifically, a 9mm semi-automatic pistol—during and in relation to the commission of the crime charged in Count One; and

3. Third, that on or about March 16, 2012, the Defendant, through an accomplice, Davon Sanford, discharged the firearm, causing the murder of Gregory Parker.

<u>Penalties</u>

3. The maximum sentences provided by statute for the offenses to which the Defendant is pleading guilty are as follows: (a) for Count One in CCB-15-0043, ten years imprisonment, a $250,000 fine and supervised release of not more than three years; (b) for Count Two in CCB-15-0550, imprisonment for any term of years or for life, a $250,000 fine, and supervised release of up to five years. In addition, the Defendant must pay $200.00 as a special assessment pursuant to 18 U.S.C. § 3013, which will be due and should be paid at or before the time of sentencing. This Court may also order him to make restitution pursuant to 18 U.S.C.§§ 3663, 3663A, and 3664.[1] If a fine or restitution is imposed, it shall be payable immediately, unless, pursuant to 18 U.S.C. § 3572(d), the Court orders otherwise. The Defendant understands that if he serves a term of imprisonment, is released on supervised release, and then violates the conditions of his supervised release, his supervised release could be revoked - even on the last day of the term - and the Defendant could be returned to custody to serve another period of incarceration and a new term of supervised release. The Defendant understands that the Bureau of Prisons has sole discretion in designating the institution at which the Defendant will serve any term of imprisonment imposed.

---

[1] Pursuant to 18 U.S.C. § 3612, if the Court imposes a fine in excess of $2,500 that remains unpaid 15 days after it is imposed, the Defendant shall be charged interest on that fine, unless the Court modifies the interest payment in accordance with 18 U.S.C. § 3612(f)(3).

<u>Waiver of Rights</u>

  4.  The Defendant understands that by entering into this agreement, he surrenders certain rights as outlined below:

    a.  If the Defendant had persisted in his plea of not guilty, he would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

    b.  If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

    c.  If the Defendant went to trial, the government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in his defense, however, he would have the subpoena power of the Court to compel the witnesses to attend.

    d.  The Defendant would have the right to testify in his own defense if he so chose, and he would have the right to refuse to testify. If he chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from his decision not to testify.

    e.  If the Defendant were found guilty after a trial, he would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges against him. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

    f.  By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that he may have to answer the Court's questions both about the rights he is giving up and about the facts of his case. Any statements the Defendant makes during such a hearing would not be admissible against him during a trial except in a criminal proceeding for perjury or false statement.

    g.  If the Court accepts the Defendant's plea of guilty, there will be no further trial or proceeding of any kind, and the Court will find him guilty.

    h.  By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status. The Defendant

recognizes that if he is not a citizen of the United States, pleading guilty may have consequences with respect to his immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including his attorney or the Court, can predict with certainty the effect of a conviction on immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any potential immigration consequences.

<u>Advisory Sentencing Guidelines Apply</u>

5. The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

<u>Factual and Advisory Guidelines Stipulation</u>

6. (a) This Office and the Defendant understand, agree and stipulate to the following Statement of Facts which this Office would prove beyond reasonable doubt, and to the following applicable sentencing guidelines factors:

CCB-15-0043, Count One:

> In early 2013 the FBI was able to make, with the assistance of a cooperating witness ("CW1"), consensually recorded conversations of Slowe in which he agreed to commit a murder for money. Slowe was eventually introduced to an Undercover Officer (UC) of the Baltimore Police Department. In a conversation with the undercover officer, Slowe agreed to kill an individual for payment in cash. Additionally, Slowe requested that the undercover provide him with two guns to commit the murder.
>
> On March 27, 2013, CW1, at the direction of the FBI, placed a call from a recorded Department of Corrections (DOC) telephone to a friend. CW1 asked this friend to travel over to 934 N Rosedale Avenue and attempt to locate Tavon Slowe. The friend made his/her way to the residence and was able to place Slowe on the telephone. CW1 explained to Slowe that he had been sentenced to a lengthy period of incarceration and that he had been set up by a person he had known since he was four years old. CW1 stated, "Hey, yo, um…I need something done yo. I need it done right yo. You understand what I'm saying?" Slowe replied, "Yeah, just give me the word. Soon as you call…you already know." CW1 stated, "Yeah…we can get the hotdog for you and…like a little bit of the shit up…, a little bit of the ah, green shit up front." Slowe replied, "Yeah. Yeah. The green shit." "Hotdog" is a code word for a firearm, and "green shit" is a code word for money. Later in the call CW1 explained to Slowe, "I'ma have another girl that I be dealin' with…I'm gonna have her give you a little bit of the green shit and

give you the hot dog and then, then she probably gonna have a picture and an address, all right?" Slowe replied, "All right. That's all I need."

On April 26, 2013, an undercover officer with the Baltimore Police Department placed a call to a cellular telephone known to be used by Tavon Slowe. An unknown female, believed to be Slowe's mother, answered. The officer explained that she was calling to talk to Tavon on behalf of CW1. The female explained that she would go find Tavon and that the officer should call back in five minutes. Multiple calls were placed but no one answered the phone. At approximately 11:19 a.m., the officer arrived in a vehicle outside of 934 N Rosedale Avenue. The officer placed a call to the same cell phone and the female provided her with telephone number (443)902-8155 for Tavon Slowe. The officer placed a call and spoke with Slowe and explained that she was at the house. At approximately 11:25 a.m., Tavon Slowe and another male exited an alley and approached the officer's vehicle. Tavon Slowe got into the vehicle with the undercover. This meeting was recorded. During this meeting Slowe agreed to meet the undercover officer at a later date to receive the handguns and money. Slowe was upset that he was not getting the handguns that day and would only be paid $3,000 up front. He argued that it is usually $5,000. The going rate for a contract killing in Baltimore is $5,000.

On April 29, 2013, a controlled call was placed by CW1 to telephone number (443)902-8155. CW1 spoke with Tavon Slowe and worked out details concerning the murder for hire. Slowe expressed concerns over the officer because he did not know her. CW1 assured him that the officer was someone he could trust. Slowe stated, "She gonna have to call that phone that I called her from the other day." Slowe stated, "I'm goin go holla at Yo today for real, I'ma see, I mean, like, I mean ride behind him or something and see what's up." CW1 explained that Slowe was referring to calling Sanford (a known associate of Slowe who commits murders) so that they could follow the person to a house where they might kill him. CW1 stated, "…she (the officer) and her girlfriend were coming back tomorrow. So I mean that's probably dead, but, so it's going to be like, probably like another two, three weeks before she can put her finger on him again. You know what I mean. Somewhere he at, or she can trick his girlfriend and tell 'em where they at, eatin' dinner or something like that you can get a look at 'em, and then you ain't got do nothing. You can get a look at 'em, and you just see if you can follow 'em without him knowing you followin' 'em, and try to find a spot where you can find out where he be goin' at." Slowe replied, "You know if I get close up on 'em you know I'ma put him where he need to be." Slowe told CW1 that, "…like when you holla at her, tell her like, tell me now like what spot, like where they goin' be at tomorrow, like I'm get there before them…I already know what she look like. Just text me like, what type of vehicle she in…I'ma watch her go into the hotel room and all that, then if I feel as though it is a go, like, I, you know I catch on to everything. I'm going to see Yo, like I be catchin' on to everything, like I know an unknown nigga, that's goin' go in the hotel room. You feel me…I probably just go ahead and knock his ass out and then whatever, whatever and split all that shit and just go about our business." CW1 explained that, "you don't know if he gonna come with other dudes, or, or what…" Slowe replied, "You know I ain't worried about that…if it gotta be two birds with one stone, it be two birds

and one stone." This was a reference by Slowe that if the intended victim was not alone, Slowe would kill the other person as well.

On April 30, 2013, an arrest operation was planned for Slowe in which the UC was going to meet with Slowe and provide him the guns that he requested for the murder-for-hire. Slowe did not show up for this meeting.

On August 8, 2013 Slowe was arrested by the Baltimore Police on charges of CDS possession with intent to distribute, possession of three firearms, possession of stolen handgun. Slowe was detained on these charges.

On February 4, 2014, at the direction of the FBI, CW1 placed a call to Tavon Slowe's half-brother, Derrick Smith, for the purpose of contracting him for the same murder-for-hire. Derrick Smith, in addition to Slowe, had previously been identified by CW1 as someone that CW1 utilized for murder-for-hire contracts in Baltimore. Smith accepted this contract from CW1. Later that same day Smith received a recorded jail call from Tavon Slowe in which Smith explained that he received a call from CW1 and that he was going to meet CW1's girl that day. Slowe explained to Smith to, "watch her mood swings. You hear me?" Slowe later explained, "Just…see how like she act and how she look at you. That's why I really played off for real too…I thought she, I thought she was one of them (the police). You heard me?" Slowe later explained, "Yeah, he gave me one, you feel me…, but it…was too fishy. I thought he was tryin' to get me. You heard me?" Slowe cautioned Smith about the possibility of the "girl" being a police officer or "one of them." Additionally, Slowe admitted to taking the contract to kill the unknown person for CW1 but that he did not show up on April 30, 2013 because he believed the female point-of-contact was a police officer.

The aforementioned conduct constitutes the crime of Use of Interstate Commerce Facilities in the Commission of Murder-for-Hire, in violation of 18 U.S.C. § 1958. U.S.S.G. § 2E1.4 establishes a base offense level of 32 for this offense, as charged in Count One of CCB-15-0043.

CCB-15-0550, Count Two:

In March 2012, a physical altercation took place in the vicinity of West Patterson Park Avenue and Chase Street in Baltimore. One of the participants to this altercation was Gregory Parker. In the days following the altercation, CW1 was given a "contract" to kill Gregory Parker. CW1 was instructed not to personally kill Parker but was to find one or more individuals to kill Parker. CW1 arranged with Tavon Slowe to kill Gregory Parker. The agreed price for the murder was $5,000.

On March 16, 2012, CW1 called Slowe on a cellular telephone and the two met in person at approximately 2:30pm. Slowe drove in a silver Honda accord to meet CW1. Davon Sanford was seated in the front passenger seat. CW1 spoke to Slowe about Parker, and CW1 told Slowe where Parker could be found and described Parker as wearing a blue floppy (Gilligan style) hat. Slowe asked CW1 for a "hot dog"—a gun—

but CW1 told Slowe that he did not have a gun with him. Slowe told CW1 that Slowe would use his own if CW1 would replace it after Parker had been killed. CW1 agreed.

On March 16, 2012, at approximately 3:50pm, Gregory Parker was shot multiple times with a 9mm semi-automatic pistol in the 2300 block of East Chase Street in Baltimore City. Fourteen shell casings were found at the scene. Parker was wearing a blue floppy (Gilligan style) hat when he was shot and killed. Witnesses describe the assailant as a black male, aged in his early twenties, and who wore a green hooded sweatshirt with white lettering across the front. The "shooter" fled northbound on Bradford Street and got into a silver vehicle. The escape of the "shooter" was captured on surveillance video from locations in that area. The getaway vehicle was a silver Honda Accord, and was the same vehicle driven earlier by Slowe when he met with CW1.

Video surveillance depicts Davon Sanford (a/k/a "Chronic") running from the murder scene and getting into the silver Honda Accord driven by Slowe. Photographs recovered from the cellular phone of Slowe's brother, Derrick Smith, depict Davon Sanford wearing the same green hooded sweatshirt with white lettering across the front.

The aforementioned conduct constitutes the crime of Use and Discharge of a Firearm During and in Relation to a Crime of Violence Resulting in Death (specifically, Conspiracy to Use Interstate Commerce Facilities in a Murder-for-Hire Resulting in Death), in violation of 18 U.S.C. § 924(c) and (j). U.S.S.G. § 2A1.1 establishes a base offense level of 43 for this offense, as charged in Count Two of CCB-15-0550.

(b) The United States does not oppose a two-level reduction in the Defendant's adjusted offense level, based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for her criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional one-level decrease in recognition of the Defendant's timely notification of his intention to plead guilty. Therefore, the net offense level is 29 under CCB-15-0043 and 40 under CCB-15-0550. This Office may oppose any adjustment for acceptance of responsibility if the Defendant (a) fails to admit each and every item in the factual stipulation; (b) denies involvement in the offenses; (c) gives conflicting statements about his involvement in the offenses; (d) is untruthful with the Court, this Office, or the United States Probation Office; (e) obstructs or attempts to obstruct justice prior to sentencing; (f) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (g) attempts to withdraw his plea of guilty.

(c) **The parties stipulate and agree pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) that the agreed sentence under CCB-15-0043 is ten years on Count One of that Indictment, said sentence to run concurrently with a sentence within the range of 23 to 27 years on Count Two under CCB-15-0550. This agreement does not affect the Court's discretion to impose any lawful term of supervised release or fine or to set any lawful conditions of supervised release. In the event that the Court rejects this plea agreement, either party may elect to declare the agreement null and void. Should the Defendant so elect, he will be afforded the opportunity to withdraw his plea pursuant to the provisions of Federal Rule of Criminal Procedure 11(c)(5).**

7.      The Defendant understands that there is no agreement as to his criminal history or criminal history category, and that his criminal history could alter his offense level if he is a career offender or if the instant offense was a part of a pattern of criminal conduct from which he derived a substantial portion of his income.

8.      This Office and the Defendant agree that with respect to the calculation of the advisory guidelines range, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines will be raised or are in dispute. The Defendant may raise factors contained in 18 U.S.C. § 3553(a) in mitigation of sentence.

### Obligations of the United States Attorney's Office

9.      At the time of sentencing, this Office will recommend the sentence agreed upon by the parties pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C). This Office will also move to dismiss any open counts against the Defendant.

10.     The parties reserve the right to bring to the Court's attention at the time of sentencing, and the Court will be entitled to consider, all relevant information concerning the Defendant's background, character and conduct.

### Waiver of Appeal

11.     In exchange for the concessions made by this Office and the Defendant in this plea agreement, this Office and the Defendant waive their rights to appeal as follows:

  a. The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or otherwise, to appeal the Defendant's conviction.

  b. The Defendant and this Office knowingly waive all right, pursuant to 18 U.S.C. § 3742 or otherwise, to appeal whatever sentence is imposed (including the right to appeal any issues that relate to the establishment of the advisory guidelines range, the determination of the defendant's criminal history, the weighing of the sentencing factors, and the decision whether to impose and the calculation of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release).

  c. Nothing in this agreement shall be construed to prevent the Defendant or this Office from invoking the provisions of Federal Rule of Criminal Procedure 35(a) or from appealing from any decision thereunder, should a sentence be imposed that results from arithmetical, technical, or other clear error.

### Obstruction or Other Violations of Law

12. The Defendant agrees that he will not commit any offense in violation of federal, state or local law between the date of this agreement and his sentencing in this case. In the event that the Defendant (i) engages in conduct after the date of this agreement which would justify a finding of obstruction of justice under U.S.S.G. § 3C1.1, or (ii) fails to accept personal responsibility for his conduct by failing to acknowledge his guilt to the probation officer who prepares the Presentence Report, or (iii) commits any offense in violation of federal, state or local law, then this Office will be relieved of its obligations to the Defendant as reflected in this agreement. Specifically, this Office will be free to argue sentencing guidelines factors other than those stipulated in this agreement, and it will also be free to make sentencing recommendations other than those set out in this agreement. As with any alleged breach of this agreement, this Office will bear the burden of convincing the Court of the Defendant's obstructive or unlawful behavior and/or failure to acknowledge personal responsibility by a preponderance of the evidence. The Defendant acknowledges that he may not withdraw his guilty plea because this Office is relieved of its obligations under the agreement pursuant to this paragraph.

### Court Not a Party

13. The Defendant expressly understands that the Court is not a party to this agreement. In the federal system, sentence is imposed by the Court, and the Court is under no obligation to accept this plea agreement between the Office and the Defendant. In the event the Court rejects the agreed-upon sentence reached by the parties under Federal Rule of Criminal Procedure 11(c)(1)(C), under Rule 11(c)(5)(C) the Defendant will be informed that he may withdraw his plea of guilty. If he persists in the guilty plea thereafter, the Defendant understands that the disposition of the case may be less favorable than that contemplated by this agreement. The Defendant understands that neither the prosecutor, his counsel, nor the Court can make a binding prediction or promise that the Court will accept this agreement. The Defendant agrees that no one has made such a binding prediction or promise.

### Entire Agreement

14. This letter supersedes any prior understandings, promises, or conditions between this Office and the Defendant and, together with the Sealed Supplement, constitutes the complete plea agreement in this case. The Defendant acknowledges that there are no other agreements, promises, undertakings or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement and none will be entered into unless in writing and signed by all parties.

\* \* \* \* \*

If the Defendant fully accepts each and every term and condition of this agreement, please sign and have the Defendant sign the original and return it to me promptly.

                                                    Very truly yours,
                                                   Rod J. Rosenstein
                                                   United States Attorney

By: _____
          James G. Warwick
          Assistant United States Attorney

I have read this agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

_Sept 6, 2016_                         _____
Date                                         Tavon Slowe

I am Mr. Slowe's attorney. I have carefully reviewed every part of this agreement, including the Sealed Supplement, with him. He advises me that he understands and accepts its terms. To my knowledge, his decision to enter into this agreement is an informed and voluntary one.

_Sept. 6. 2016_                        _____
Date                                         William B. Purpura, Esq.